IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| POLY-AMERICA, L.P., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 13-693-SLR |
| | ) |
| API INDUSTRIES, INC., | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM ORDER**

At Wilmington this 6th day of August, 2014, having reviewed defendant's motion for reconsideration and the response thereto;

IT IS ORDERED that said motion (D.I. 84) is denied, for the reasons that follow:

1. **Standard of review.** A motion for reconsideration is the "functional equivalent" of a motion to alter or amend judgment under Federal Rule of Civil Procedure 59(e). *See Jones v. Pittsburgh Nat'l Corp.*, 899 F.2d 1350, 1352 (3d Cir. 1990) (citing *Fed. Kemper Ins. Co. v. Rauscher*, 807 F.2d 345, 348 (3d Cir. 1986)). The standard for obtaining relief under Rule 59(e) is difficult to meet. The purpose of a motion for reconsideration is to "correct manifest errors of law or fact or to present newly discovered evidence." *Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999). A court should exercise its discretion to alter or amend its judgment only if the movant demonstrates one of the following: (1) a change in the controlling law; (2) a need to correct a clear error of law or fact or to prevent

manifest injustice; or (3) availability of new evidence not available when the judgment was granted. *See id.* A motion for reconsideration is not properly grounded on a request that a court rethink a decision already made and may not be used "as a means to argue new facts or issues that inexcusably were not presented to the court in the matter previously decided." *Brambles USA, Inc. v. Blocker*, 735 F. Supp. 1239, 1240 (D. Del. 1990); *see also Glendon Energy Co. v. Borough of Glendon*, 836 F. Supp. 1109, 1122 (E.D. Pa. 1993).

2. API argues in its motion that, "[a]s a matter of law, the 'ordinary observer' for the design of a component of product packing is the industrial purchaser that uses that packaging component to assemble a finished retail product with content." (D.I. 84 at 2) In this regard, API cites to *Arminak and Associates, Inc. v. Saint-Gobain Calmar, Inc.*, 501 F.3d 1314 (Fed. Cir. 2007). I respectfully disagree with API's analysis.

3. I start with the Supreme Court's decision in *Gorham Manufacturing Co. v. White,* 81 U.S. (14 Wall.) 511 (1871), where the Court expressly excluded experts from the category of persons who are ordinary observers, explaining that "ordinary observers" are people possessing "ordinary acuteness, bringing to the examination of the article upon which the design has been placed that degree of observation which men of ordinary intelligence give." *Id.* at 528. The Court went on to explain that the ordinary observers of a patented design were "the principle purchasers of the articles to which designs have given novel appearances," i.e., "those who buy and use" the article bearing the design in question. *Id.*

4. The Federal Circuit has since reviewed the "ordinary observer" test in various

2

factual scenarios. For instance, in *Goodyear Tire & Rubber Co. v. Hercules Tire & Rubber Co.*, 162 F.3d 1113 (Fed. Cir. 1998), the Court addressed the test in the context of patented tire tread designs commercially embodied on Goodyear's truck tires. The Court stated that "the focus [of the test] is on the actual product that is presented for purchase, and the ordinary purchaser of that product." *Id.* at 1117. Because the accused tire was a truck tire, the Court concluded that "the ordinary trucker or fleet operator who purchases truck tires" was the appropriate "person from whose viewpoint deceptive similarity to the '080 design" should be determined. *Id.*

5. In *Goodyear*, then, the Court narrowed the focus of the ordinary observer test by narrowing both the class of products at issue (truck tires, not just any tires) and the class of principle purchasers (truck drivers and fleet operators). In *KeyStone Retaining Wall Sys., Inc. v. Westrock, Inc.*, 997 F.2d 1444 (Fed. Cir. 1993), in the context of a block design patent, the Court did the same, that is, narrowed the class of principle purchasers by narrowing the products at issue, concluding that the "ordinary observer" was a purchaser of the patented block, not a purchaser of the unpatented wall. *Id.* at 1451.

6. Which brings us to *Arminak*, a case between two parties in the business of selling trigger sprayers to producers of liquid household products. The design patents at issue were directed to a component part of the trigger mechanism, called the shroud. In its analysis of the "ordinary observer" test, the Federal Circuit explained that it was

> [t]he industrial purchaser of the trigger sprayer shrouds for manufacturing assembly [who "uses"] the shrouds - to cover trigger sprayer mechanisms that are assembled with the bottle, the bottle's cap, the liquid contained in the bottle, and the label on the bottle, all of which assembled

3

together create the retail product. Consequently, the purchaser of the patented and accused designs in this case is the purchaser of one of a retail product's component parts that is thereafter assembled with other parts to make the retail product. To hold that such a purchaser is the appropriate hypothetical ordinary observer fits squarely with our precedent that the ordinary observer is a person who is either a purchaser of, or sufficiently interested in, the item that displays the patented designs and who has the capability of making a reasonably discerning decision when observing the accused item's design whether the accused item is substantially the same as the item claimed in the design patent.

501 F.3d at 1323. The Court concluded that the "ordinary observer of the sprayer shroud designs at issue in this case is the industrial purchaser or contract buyer of sprayer shrouds for businesses that assemble the retail product from the component parts of the retail product bottle, the cap, the sprayer tube, the liquid, the label, and the trigger sprayer device atop the cap, so as to create a single product sold to the retail consumer." *Id.* In short, the ordinary observer was "the contract or industrial buyer for companies that purchase the stand-alone trigger sprayer devices, not the retail purchasers of the finished product." *Id.* at 1324.

7. With this background, API argues that, because the accused design is for "an ordinary, but empty, six-sided folding box," the "empty box of the '719 [p]atent[1] is merely a component part of the packaging for the product contained within (bags), ultimately sold as a fully packaged and assembled unit at retail." (D.I. 84 at 3, 4) According to API, the "ordinary observer" in the case at bar should not be the retail consumer of the product when it is merchandised in the store, but "the industrial purchaser or contract buyer . . . for businesses that assemble the retail product" (D.I. 84 at 1), to wit, API.

---

[1]U.S. Patent No. D569,719 S, entitled "Product Container" ("the '719 patent").

4

8. I suggest that the facts at bar have not been specifically addressed by the Federal Circuit, and that they fall somewhere between the facts analyzed in *Goodyear* (where the accused design was an integral part of the retail product itself) and those analyzed in *Arminak* (where the accused design was only one of many component parts of the packaging of the retail product). In this regard, I respectfully disagree with API's contention that I have erred "as a matter of law" in my identification of the "ordinary observer" in this case. I certainly recognize that the retail consumer is not buying the box itself as a stand-alone product (as the consumer in *Goodyear* was buying the truck tire). Nevertheless, the box design at issue could contain anything; the retail products within are fungible to at least some extent. Unlike the sprayer shroud in *Arminak*, which admittedly would not be noticed by most retail consumers, API's products are only presented, identified, and accessed through their containers that display the patented designs. I concede that API may have more expertise in comparing box designs than a retail consumer. Nevertheless, it is the retail consumer who both buys the packaged product based at least in part on its retail presentation, and is actually charged with using the design feature at issue, that is, opening the box to get to the product. Because the focus of this analysis is for the "ordinary observer," not someone with expertise in the matter of design comparisons, I decline to reconsider my identification of the ordinary observer in this case.

9. API also argues that I erred in applying the "ordinary observer" test because the perception of the hypothetical purchaser must include "both the accused box and, side by side, 'all views' shown in the design patent figures." (D.I. 84 at 6) For this proposition, API cites to *Contessa Food Products, Inc. v. Conagra, Inc.*, 282 F.3d 1370

(Fed. Cir. 2002). In *Contessa*, the design at issue was for a serving tray with shrimp. The Federal Circuit reversed a finding of infringement based on the district court's failure to include the underside of the accused tray (depicted in figure 4 of the patent at issue) in its side-by-side comparison of the accused tray and the patented design, directing on remand that "[t]he overall features of the top, side and underside of the accused products must be compared with the patent design as a whole as depicted in all of the drawing figures to determine infringement." *Id.* at 1381. In explaining its decision, the Court reiterated the principle that "'articles which are concealed or obscure [sic] **in normal use** are not proper subjects for design patents, since their appearance cannot be a matter of concern.'" *Id.* at 1379 (citation omitted). "Normal use" in the design patent context was held "to extend over 'a period in the article's life, beginning after completion of manufacture or assembly and ending with the ultimate destruction, loss, or disappearance of the article.'" *Id.* (citation omitted). Therefore,

> [r]ather than limiting the assessment of infringement to the point of purchase, the *Gorham* test applies an objective frame of reference, the hypothetical purchasing decision to be made by an ordinary observer, to all ornamental features visible at any time during the normal use of a product. One must compare the ornamental features of the patented design, as shown in all of the drawings, to the features of the alleged infringing product visible at any time during the normal use of the product and assess "if the resemblance [at such point] is such as to deceive . . . an ordinary observer, giving such attention as a purchaser usually gives, . . . inducing him to purchase one supposing it to be the other."

282 F.3d at 1381 (citing *Gorham*, 81 U.S. (14 Wall.) at 528).

10. As I interpret the above in the context of this case, I come to several conclusions. In the first instance, the "normal use" of the product at issue - a box

6

containing plastic trash bags - extends well beyond the stage of manufacturing (where API would place the hypothetical purchaser) and retail sale to the homes of the retail consumers who open the boxes to use the bags. In this regard, the flaps depicted in figures 8-10 of the '719 patent are not visible at any time during the normal use of the product. Rather than support API's position, then, I conclude that the analysis in *Contessa* confirms my initial analysis.

11. **Conclusion.** Based on the above reasoning, and keeping in mind that API moved for judgment on the pleadings at the outset of the case,[2] API's motion for reconsideration is denied.

                                                           /s/
                                        United States District Judge

---

[2] Unlike *Arminak* and *Contessa*, which were reviews of judgments entered after a summary judgment motion practice.

7